EDISON v. AMERICAN MUTOSCOPE CO.

(Circuit Court of Appeals, Second Circuit. March 10, 1902.)

No. 75.

PATENTS—INVENTION—KINETOGRAPHIC CAMERA.

In the Edison patent, No. 589,168, for a kinetographic camera, claims 1, 2, and 3, which cover any camera apparatus which includes a stationary single lens and a tapelike film, and is capable of intermittently projecting, at such rapid rate as to result in persistence of vision, images of successive positions of an object or objects in motion, and any mechanism or device for so moving the film as to cause the successive images to be received thereon separately and in single-line sequence, without speci-

fying the mechanisms to be employed, except functionally, are void, as broader than the actual invention of the patentee, which, in view of the prior art, was limited to the details of organization by which he accomplished such results, and which are not described. Claim 5, covering a tapelike photographic film having thereon equidistant photographs of successive positions of an object in motion, in straight-line sequence, is also void for lack of invention, as distinguished from nonpatentable improvement upon films previously known.

Appeal from the Circuit Court of the United States for the Southern District of New York.

This was an appeal from a decree adjudging the validity and infringement of letters patent No. 589,168, granted August 31, 1897, to Thomas A. Edison, for a kinetographic camera. See 110 Fed. 660, 664.

Parker W. Page and Thos. B. Kerr, for appellant.
Richard N. Dyer and Fredk. P. Fish, for appellee.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

WALLACE, Circuit Judge. This is an appeal from a decree sustaining the validity, and adjudging the infringement by the defendant, of letters patent No. 589,168, for a kinetographic camera, granted to Thomas A. Edison August 31, 1897. The patent contains six claims; the first, second, third, and fifth being the only ones in controversy. The assignments of error challenge the validity of the claims, and contest the infringement of the fifth claim.

The purpose of the patented invention is to produce pictures, "representing objects in motion throughout an extended period of time, which may be utilized to exhibit the scene including such moving objects in a perfect and natural manner by means of a suitable exhibiting apparatus," such as that described in Edison's patent No. 493,426, granted March 14, 1893. The specification states that the inventor "has found it possible to accomplish this end by means of photography." It further states that the photographic apparatus comprises means, such as a single camera, for intermittently projecting, at such rapid rate as to result in persistence of vision, images of successive positions of the object or objects in motion as observed from a fixed and single point of view, a sensitized tapelike film, and means for so moving the film as to cause the successive images to be received thereon separately and in single-line sequence. It further states that the movements of the tapelike film may be continuous or intermittent, but the latter is preferable, and that it is further preferable that the periods of rest of the film should be longer than the periods of movement. It further states that, by taking the photographs at a rate sufficiently high as to result in persistence of vision, the developed photographs will, when brought successively into view by an exhibiting apparatus, reproduce the movements faithfully and naturally. The patentee says:

"I have been able to take with a single camera and a tape film as many as forty-six photographs per second, each having a size measured lengthwise

of the tape of one inch, and I have also been able to hold the tape at rest for nine-tenths of the time; but I do not wish to limit the scope of my invention to this high rate of speed, nor to this great disproportion between the periods of rest and the periods of motion, since with some subjects a speed as low as thirty pictures per second, or even lower, is sufficient, and, while it is desirable to make the periods of rest as much longer than the periods of motion as possible, any excess of the periods of rest over the periods of motion is advantageous."

As more particularly described in the specification and shown in the drawings, the apparatus, which is inclosed in a boxlike casing, from which light will be excluded, except through the lens, embraces an ordinary adjustable camera having the lens end mounted in the side of the box. Two reels, inclosed in suitable cases, are located on opposite sides of the camera lens. The film is drawn from one of the reels onto the other across the lens. It is transparent or translucent, and tapelike in form, and is preferably of sufficient width to admit the taking of pictures one inch in diameter between the rows of holes on its edges. These holes are for engagement with the feed wheels for positively advancing the film. When the film is narrow it is not essential to use two rows of perforations and two feed wheels, one of such rows and one feed wheel being sufficient. The two feed wheels are carried by a shaft, and engage the film on one side of the camera opening. The power is supplied by an electric motor which drives a rotating shaft carrying the feed wheels through a pulley held in frictional engagement with the feed-wheel shaft. The take-up reel, or the reel which receives the tape after passing the lens, is also driven from the motor shaft through a pulley which is frictionally mounted upon the reel shaft. The shaft carrying the feed wheels is controlled by a stop or escapement movement which is driven positively by another shaft, so that, although the motor tends to drive the feed wheels continuously, they are only permitted to turn with an intermittent motion by the stop or escapement device; the pulley which drives the feed wheels slipping on the feed-wheel shaft while that shaft is held at rest by the stop or escapement device. A shutter consisting of a rotating disk having an opening in it is mounted directly upon the motor shaft, and revolves past the lens, so that the light from the lens is intermittently thrown upon and cut off from the sensitive surface of the film. The camera is shown as a single lens, and is arranged to project the image of the scene being photographed upon the film when the openings of the shutter disk are opposite the aperture between the lens and the film. In operation the apparatus is first charged with a tape film several hundred or even thousands of feet in length. The specification states that the parts are preferably proportioned so that the film is at rest for nine-tenths of the time, in order to give the sensitized film as long an exposure as practicable, and is moving forward one-tenth of the time, and that the forward movement is made to take place 30 or more times per second, and preferably at least as high as 46 times per second, although the rapidity of movement or number of times per second may be regulated as desired to give satisfactory results; and there should be at least enough so that the eye of the observer cannot distinguish, or at least cannot clearly or positively distinguish, at a glance, the difference in position occupied by the objects in the successive pictures.

The claims alleged to be infringed are as follows:

"(1) An apparatus for effecting by photography a representation, suitable for reproduction, of a scene including a moving object or objects, comprising a means for intermittently projecting, at such rapid rate as to result in persistence of vision, images of successive positions of the object or objects in motion, as observed from a fixed and single point of view, a sensitized, tapelike film, and a means for so moving the film as to cause the successive images to be received thereon separately and in a single-line sequence.

"(2) An apparatus for taking photographs suitable for the exhibition of objects in motion, having in combination a single camera, and means for passing a sensitized tape film at a high rate of speed across the lens of the camera, and for exposing successive portions of the film in rapid succession, substantially as set forth.

"(3) An apparatus for taking photographs suitable for the exhibition of objects in motion, having in combination a single camera, and means for passing a sensitized tape film across the lens of the camera at a high rate of speed, and with an intermittent motion, and for exposing successive portions of the film during the periods of rest, substantially as set forth."

"(5) An unbroken transparent or translucent tapelike photographic film, having thereon equidistant photographs of successive positions of an object in motion, all taken from the same point of view, such photographs being arranged in a continuous, straight-line sequence, unlimited in number, save by the length of the film, substantially as described."

According to the views of the expert for the complainant, the first claim covers every apparatus comprising—First, any means whatever capable of intermittently projecting, at such rapid rate as to result in persistence of vision, images of successive positions of the object or objects in motion, as observed from a fixed and single point of view; second, a sensitized, tapelike film; and, third, any means or mechanism or device for so moving the film, either continuously or intermittently, or both continuously and intermittently, as to cause the successive images to be received thereon separately and in a single-line sequence. According to his view, the scope of the second claim is identical with that of the first, except that it is limited to a single camera, with a single lens, as the means for projecting the images onto the sensitized surface, and the third claim differs from the second only in that it is restricted to the intermittent movement of the film, and to the exposure of the film during the periods of rest. We think this interpretation of the claims is the reasonable one, and the question of their validity is to be determined by giving to them this scope.

The photographic reproduction of moving objects, the production from the negatives of a series of pictures representing the successive stages of motion, and the presentation of them by an exhibiting apparatus to the eye of the spectator in such rapid sequence as to blend them together, and give the effect of a single picture in which the objects are moving, had been accomplished long before Mr. Edison entered the field. The patent in suit pertains merely to that branch of the art which consists of the production of suitable negatives. The introduction of instantaneous photography, by facilitating the taking of the negatives with the necessary rapidity to secure what is termed "persistence of vision," led to the devising of cameras for using sensitized plates and bringing them successively into the field of the lens, and later for using a continuously moving sensitized band or strip of

paper to receive the successive exposures. The invention of the patent in suit was made by Mr. Edison in the summer of 1889. We shall consider only those references to the prior art which show the nearest approximation to it, and are the most valuable of those which have been introduced for the purpose of negativing the novelty of its claims.

The French patent to Du Cos, of 1864, describes a camera apparatus consisting of a battery of lenses placed together in parallel rows, and focused upon a sensitive plate; the lenses being caused to act in rapid succession, by means of a suitable shutter, to depict the successive stages of movement of the object to be photographed. Between the lenses and the plate is arranged a band having a series of openings in such manner that if the band is drawn upwards or downwards the various lenses in the battery will be exposed in succession, so that a large number of small pictures will be taken upon the plate. The patent does not describe the means for moving the plate so as to cause the successive images to be received thereon separately. In a certificate of addition to this patent, he describes an apparatus in which there is a short, endless band, passing over two parallel drums, upon which, as the band is moved by the rotation of the drums, one lens after the other will pass an aperture through which light is reflected from the object to be photographed. Back of the lenses is another band of fabric, passing over drums like the other band, and carrying either a series of sensitized plates or a surface of sensitized paper. This band has projections or pins, which, as the drums are rotated, engage with corresponding projections from the band carrying the lenses. By this apparatus the lenses are made to move in accord with the movement of the band, and as they pass the aperture they project successively upon the sensitized paper, which is moving at the same speed, impressions of the object to be photographed. Practically the images are reproduced from the same point of view,—the aperture through which the lenses operate. The expert for the complainant, Prof. Morton, concedes that the Du Cos camera would be capable of taking a series of photographs on a strip of sensitized paper, such as subsequently came into commercial use, at the rate of eight or ten a second, supposing them to be two or three inches square; but he insists that the dry paper then known was not sufficiently sensitized to permit this to be done.

Prior to January, 1888, a sensitive film better adapted for instantaneous impression was in commercial use with photographers, and in that month a patent was obtained in this country by Le Prince for a method of, and apparatus for, producing animated pictures. The apparatus included a camera for producing the negatives upon an endless strip of sensitive film, "or any quick-acting paper, such as Eastman's paper film." The camera apparatus was a series of lenses arranged in two or more rows, and two or more strips of film. Each strip of film is unwound from a supply spool, and drawn across the field of its row of lenses by a take-up spool. The lenses are provided with shutters which open and allow them to operate upon the film at the proper time. By means of mutilated guides upon a shaft operated by a crank or other motor, the two take-up spools are alter-

nately revolved, and draw first one film and then the other the required distance to receive its series of impressions, while by means of other guides connected with the driving shaft the shutters of the lenses are successively opened to permit an impression to be projected upon the film while it is at rest.   Thus the apparatus is equipped with means for moving two strips of film alternately and successively, and with lenses and shutters which at the proper moment open and allow the lenses to operate upon the strips of film as they are successively brought to rest.   Le Prince subsequently, and in 1888, obtained an English patent for the same apparatus, a complete specification of which was published December 8, 1888.   This patent contains a suggestion that only a single lens may be employed, as follows:

"When provided with only one lens, as it sometimes may be, it is so constructed that the sensitive film is intermittently operated at the rear of said lens, which is provided with a properly timed intermittently operated shutter."

The mechanism adapted to co-operate with a single-lens camera is not described.

The camera apparatus of M. Marey, described in the Scientific American of June, 1882, and used by him, mounted in a photographic gun, to produce a series of instantaneous photographs, showing the successive phases of motion of birds and animals, describes a single-lens camera, and clock mechanism which actuates the several parts. The apparatus is shown in detail by woodcuts.   M. Marey conceived the idea of equipping a gun with the apparatus from the astronomical revolver invented by Mr. Janssen for observing the last passage of Venus.   He describes the apparatus as follows:

"The barrel of this gun is a tube containing a photographic objective.   At the back end of this, firmly affixed to the butt, there is a wide, cylindrical breech piece, in which there is contained a clockwork, whose barrel is seen externally at B.   When the trigger of the gun is pulled, the wheelwork begins its movement, and gives the various parts of the instrument the motion necessary.   A central axis, making twelve revolutions per second, controls all the parts of the apparatus.   First, there is an opaque, metallic disk, containing a narrow slit.   This forms the cut-off or shutter, and allows the light emanating from the objective to enter only twelve times per second, and every time during $1/720$th of a second.   Behind this disk, and revolving freely on the same axis, there is another one which is provided with twelve openings, and behind this is placed the sensitive plate of circular or octagonal form.   The disk must revolve in an intermittent manner, so as to stop twelve times per second opposite the fascicle of light that enters the instrument. This motion is obtained by means of an eccentric, E, which is placed on the axis, gives a regular to and from motion to a rod provided with a click, C, which at every oscillation engages with one of the teeth that collectively form a crown on the disk containing the apertures.   A special shutter, O, cuts off all entrance of light into the instrument as soon as the twelve images have been obtained.   There are other arrangements for the purpose of preventing the sensitized plate, owing to its acquired velocity, going beyond the position to which it is brought by the click, and at which it should be perfectly immovable during the duration of the luminous impression.   A pressing button, b, rests firmly against the plate from the time that it is introduced into the apparatus; and it is through the influence of such pressure that the plate is made to adhere to the posterior surface of the disk containing the apertures.   This surface is covered with black velvet to prevent slipping.   Focusing is effected by shortening or elongating the barrel, thus moving the objective backward or forward.   The focus is finally verified

by observing, through an aperture in the breech piece, the sharpness of the image received on a piece of ground glass."

He states that he has photographed with his apparatus horses, asses, dogs, and men on foot and on velocipedes, but he has not followed such experiments up, as they entered into the programme that Mr. Muybridge had carried out with so much success. He proposes especially to study by photography the mechanism of flight in different animals.

Mr. Levison, in an article published in the Brooklyn Eagle of June 14, 1888, describes a camera apparatus for taking a series of pictures of objects in motion, in which a single lens is employed to operate upon plates 3¼ by 4¼ inches in size. These plates are carried in compartments on a polygonal wheel, which is caused to move onward and rest by a peculiar screw motion, and while at rest an electromagnet, actuated by a suitable battery, operates the shutter and exposes the plate, then in proper position for the lens. He says the mechanism employed to drive the plate carrier could be employed to operate a continuous strip of paper or a film carrier, and by a simple modification of the contact switch the shutter may be operated indefinitely; and with a camera thus constructed a series of pictures, limited only by the length of the sensitive paper, may be taken. The mechanism of the apparatus is not detailed, except in the general way stated.

It is apparent from the references considered that while Mr. Edison was not the first to devise a camera apparatus for taking negatives of objects in motion, and at a rate sufficiently high to result in persistence of vision, the prior art does not disclose the specific type of apparatus which is described in his patent. His apparatus is capable of using a single sensitized and flexible film of great length with a single-lens camera, and of producing an indefinite number of negatives on such a film with a rapidity theretofore unknown. The Du Cos apparatus requires the use of a large number of lenses in succession, and both the lens and the sensitized surface are in continuous motion while the picture is being taken; whereas in the apparatus of the patent but a single lens is employed, which is always at rest, and the film is also at rest at the time when the negative is being taken. Nor is it provided with means for passing the sensitized surface across the camera lenses at the very high rate of speed, which is a feature, though not an essential feature, of the patented apparatus.

The Le Prince apparatus employs two or more rows of lenses, and two or more strips of film, which move alternately and successively, the lenses of each operating upon its appropriate strip, and the shutters of the lenses opening successively as the strips are brought to rest; and, although its devices permit the exposures for the production of successive pictures to be made in rapid succession, they require a slow movement of the film. Pictures taken in such apparatus are not taken from the "same point of view" as they are when taken from a single stationary lens. This would result in producing, when such pictures are subsequently combined for persistence of vision in their exhibition, a greater or less indefiniteness of outline and conformation as to movement. Again, the pictures are not taken in a

regular succession, as on a single strip, but a short series are taken on one strip, then a short succeeding series on another strip, and so on, with the result that to use these pictures for exhibition in any convenient way would require them to be cut up and rearranged, or apparatus would have to be employed for so moving and feeding them as to obtain the proper arrangement of their positives for the purposes of exhibition, which is indicated in the Le Prince patent. Those taken by the apparatus of the patent in suit can be reproduced by a precisely corresponding positive. The suggestion that one lens may be employed, implying, of course, the use of a single film, is quite enigmatical, and would seem to be impracticable, without altering the principle of his apparatus. The problem of dispensing with the other lenses would involve changing the mechanism so as to secure a rapid movement of the film. We are not satisfied that the apparatus is inoperative, but incline to the opinion that the alleged defects are merely in details of construction, which would be readily obviated by the skilled mechanic. The presumption arising from the grant of the United States patent must prevail in the absence of proof to overthrow it.

The Marey apparatus employs the same general combination of parts specified in the first and third claims of the patent, except the tape film, to produce the negatives; but it is not adapted to produce them upon the film of the patent, and it would require modifications to enable it to do so; but whether such as would involve invention, or merely mechanical skill, is a debatable question. It enables negatives of an animate object, showing the various phases of motion, to be produced by projecting images of the moving object, as observed from a fixed and single point of view, or from a fixed and successive point of view, upon the successively advanced portions of the sensitized surface, and in sequence thereon, and at such a rapid rate of succession that the movements can be naturally reproduced to the eye by bringing the developed photographs successively into view. It is capable of taking 12 pictures per second, each image requiring an exposure of $1/720$th part of a second. Although his revolver was designed to get successive pictures for an analysis of the movements of objects, and not for the purpose of taking negatives for reproduction and use in an exhibiting apparatus, it seems manifest that it could have been adapted by changes in the parts, obvious to the skilled mechanic, to produce negatives suitable for reproduction and use in such an apparatus.

The Levison publication would not be of value were it not that the broad claims of the patent do not call for the employment of any specific operative devices, except the single camera and the sensitized tape film.

The important question is whether the invention was in such sense a primary one as to authorize the claims based upon it. The general statements in the specification imply that Mr. Edison was the creator of the art to which the patent relates, and the descriptive parts are carefully framed to lay the foundation for generic claims which are not to be limited by importing into them any of the operative devices, except those which are indispensable to effect the functional

results enumerated. It will be observed that neither the means for moving the film across the lens of the camera, nor for exposing successive portions of it to the operation of the lens, nor for giving it a continuous or intermittent motion, nor for doing these things at a high rate of speed, are specified in the claims otherwise than functionally. Any combination of means that will do these things at a high enough rate of speed to secure the result of persistence of vision, and which includes a stationary single lens and tapelike film, is covered by the claims.

It is obvious that Mr. Edison was not a pioneer, in the large sense of the term, or in the more limited sense in which he would have been if he had also invented the film. He was not the inventor of the film. He was not the first inventor of apparatus capable of producing suitable negatives, taken from practically a single point of view, in single-line sequence, upon a film like his, and embodying the same general means of rotating drums and shutters for bringing the sensitized surface across the lens, and exposing successive portions of it in rapid succession. Du Cos anticipated him in this, notwithstanding he did not use the film. Neither was he the first inventor of apparatus capable of producing suitable negatives, and embodying means for passing a sensitized surface across a single-lens camera at a high rate of speed, and with an intermittent motion, and for exposing successive portions of the surfaces during the periods of rest. His claim for such an apparatus was rejected by the patent office, and he acquiesced in its rejection. He was anticipated in this by Marey, and Marey also anticipated him in photographing successive positions of the object in motion from the same point of view.

The predecessors of Edison invented apparatus, during a period of transition from plates to flexible paper film, and from paper film to celluloid film, which was capable of producing negatives suitable for reproduction in exhibiting machines. No new principle was to be discovered, or essentially new form of machine invented, in order to make the improved photographic material available for that purpose. The early inventors had felt the need of such material, but, in the absence of its supply, had either contented themselves with such measure of practical success as was possible, or had allowed their plans to remain upon paper as indications of the forms of mechanical and optical apparatus which might be used when suitable photographic surfaces became available. They had not perfected the details of apparatus especially adapted for the employment of the film of the patent, and to do this required but a moderate amount of mechanical ingenuity. Undoubtedly Mr. Edison, by utilizing this film and perfecting the first apparatus for using it, met all the conditions necessary for commercial success. This, however, did not entitle him, under the patent laws, to a monopoly of all camera apparatus capable of utilizing the film. Nor did it entitle him to a monopoly of all apparatus employing a single camera.

We conclude that the functional limitations which are inserted in the claims do not restrict the patent to the scope of Mr. Edison's real invention. We cannot undertake to point out the differences between the scope of the real invention and the claims. The real

invention, if it involved invention as distinguished from improvement, probably consists of details of organization, by which the capacity of the reels and the moving devices are augmented and adapted to carry the film of the patent rapidly and properly. It suffices to say that the modifications required to conform old apparatus to the use of the tape film, and which would define the real invention, cannot be imported into the first and third claims without violence to their terms; and the second claim is broader than the third.

The fifth claim of the patent is obviously an attempt by the patentee to obtain a monopoly of the product of the apparatus described in the patent, so that in the event it should turn out that his apparatus was not patentable, or the product could be made by apparatus not infringing his, he could nevertheless enjoy the exclusive right of making it. A claim for an article of manufacture is not invalid merely because the article is the product of a machine, whether the machine is patented or unpatented; but it is invalid unless the article is new in a patentable sense,—that is, unless its original conception or production involved invention, as distinguished from ordinary mechanical skill. If it is new only in the sense that it embodies and represents superior workmanship, or is an improvement upon an old article in degree and excellence, within all authorities the claim is invalid. Hatch v. Moffitt (C. C.) 15 Fed. 252; Wooster v. Calhoun, 11 Blatchf. 215, Fed. Cas. No. 18,035; Excelsior Needle Co. v. Union Needle Co. (C. C.) 32 Fed. 221; Smith v. Nichols, 21 Wall. 112, 22 L. Ed. 566; Locomotive Works v. Medart, 158 U. S. 79, 15 Sup. Ct. 745, 39 L. Ed. 899. By the terms of the claim the length of the film is not defined, nor is the number of photographs which it is to represent defined. It is to be an unbroken transparent or translucent, tapelike photographic film; it is to have thereon equidistant photographs of successive positions of an object in motion; these photographs are to be arranged in a continuous, straight-line sequence; and the number of them is not limited, save by the length of the film. The film was not new, and if the other characteristics of the product are not new, or are new only in the sense that they add to the article merely a superiority of finish or a greater accuracy of detail, the claim is destitute of patentable novelty.

In determining the scope and patentable subject-matter of this claim, the proceedings in reference to its allowance in the patent office should be referred to. In the original application for the patent the sensitized surface was described as "in the form of a long gelatine tape film." April 18, 1896, the application was amended as to specification and claims so that the word "gelatine" was omitted from the description of the film. The substituted specification of that application contains this statement: "The sensitized surface is preferably in the form of a long tape, although it may be a cylindrical surface on which the photographs are taken in a spiral line;" and, in referring to the drawings, states that "3 indicates the transparent or translucent tape film, which before the apparatus is put in operation is all coiled on a reel," etc. In that application, for the first time, a claim was made for the product. After the claim, as originally phrased in that application, had been rejected by the patent office, it was amended by the applicant to read as follows:

936 114 FEDERAL REPORTER.

"(8) An unbroken transparent or translucent tape film, having thereon a continuous series of equidistant photographs of an object in motion, arranged in a single straight-line sequence, substantially as set forth."

This claim was again rejected upon a reference to the Le Prince patent. As finally allowed by the office, it was allowed upon the statement as follows:

"As to claims 8 and 9, while as drawn they have been properly rejected on account of the Le Prince tape film, they can be distinguished therefrom by amending the claims to indicate that the number of photographs in the series is unlimited, except by the length of the film, as distinguished from the Le Prince film, in which the number in a straight-line sequence is limited to four, whatever the length of the film."

In view of these proceedings, and the acquiescence of the patentee in the limitations imposed upon the claim by the patent office, its novelty depends mainly upon the length of the film. This feature of the claim is satisfied by any film which is long enough to carry a sufficient number of successive pictures to reproduce, when properly used, some definite cycle of movements to convey the impression of reality to the observer. A film having this characteristic was not new, in the sense that its production involved invention. The Du Cos apparatus was capable of taking the requisite number of pictures in series suitable for using in an exhibiting apparatus. Prof. Morton, the expert for the complainant, in his testimony, conceded that a series of photographs of an object in motion could have been taken upon a paper strip by the camera of the certificate of addition of the Du Cos patent, and these negatives might have been transferred to a translucent paper strip, as a series of positives, and that it would have required no invention, in view of the instructions which Du Cos gives as to doing this, to prepare such a strip of paper with a series of pictures upon it. He differentiates the film of the claim from the film which could have been thus produced in the fact that the pictures, not having been taken from a single lens, would not all be taken from the same point of view. This conclusion, however, overlooks the fact that practically the images were produced from the same point of view in the Du Cos apparatus,—the single aperture through which the lenses operate,—and that it is quite immaterial whether the same point of view is obtained by the use of a single lens, or by the use of a number of lenses, for the purpose of meeting this characteristic of the claim.

We conclude that the court below erred in sustaining the validity of the claims in controversy, and that the decree should be reversed, with costs, and with instructions to the court below to dismiss the bill.