EDISON v. AMERICAN MUTOSCOPE & BIOGRAPH CO.

(Circuit Court, S. D. New York. March 26, 1906.)

PATENTS—INFRINGEMENT—KINETOGRAPHIC CAMERA.

The Edison reissued patent, No. 12,037 (original No. 589,168), for a kinetographic camera claims 1, 2 and 3, were not anticipated, and disclose patentable invention in the means shown for imparting an intermittent movement to the tape-film while passing in front of the lens; but in view of the prior art such claims must be narrowly construed and confined to the specific feeding mechanism described. As so limited, such claims *held* not infringed. Claim 4 *held* void, as too broad.

Suit in equity to enjoin alleged infringement of United States reissued letters patent, No. 12,037, dated September 30, 1902, for kinetoscope, and for an accounting, granted to complainant Thomas A. Edison.

See 127 Fed. 361.

Gifford & Bull (J. Edgar Bull, of counsel), for complainant.
Thomas B. Kerr and Parker W. Page, for defendant

RAY, District Judge. The original letters patent, No. 589,168, were issued to complainant, Thomas A. Edison, August 31, 1897. Suit for alleged infringement thereof was brought by him against the American Mutoscope Company; claims 1, 2, 3, and 5 being in controversy, and, their validity being contested, they were adjudged invalid as embracing more than the patentee had invented, assuming that he had invented anything, by the Circuit Court of Appeals, Second Circuit. Edison v. American Mutoscope Company, 114 Fed. 926, 52 C. C. A. 546. Thereupon, for the purpose of limiting his claims, as he alleges, and of bringing them within the decision of the Circuit Court of Appeals, complainant obtained the reissue, and insists that he has so narrowed the claims that he is within that decision. This is denied by the defendant, and it is contended that while there is a change of wording, and possibly some limitation, the reissue is void for anticipation or want of patentable invention in view of the prior art. I am unable to find, on a careful perusal of the opinion of the learned judge, Judge Wallace, who delivered the opinion of the court, that the Circuit Court of Appeals undertook to define the exact scope or nature of complainant's invention, or to decide that he in fact made one. That court did decide that the claims were too broad and we may properly infer that it was of opinion complainant's devise discloses patentable invention. If, however, the claims of the reissued letters patent are substantially the same in scope as before they are open to the same objections.

Speaking of claims 1, 2, and 3 of the original patent, Judge Wallace said:

"According to the views of the expert for the complainant, the first claim covers every apparatus comprising—First, any means whatever capable of intermittently projecting, at such rapid rate as to result in persistence of vision, images of successive positions of the object or objects in motion, as observed from a fixed and single point of view; second, a sensitized, tapelike film; and, third, any means or mechanism or device for so

moving the film, either continuously or intermittently, or both continuously and intermittently, as to cause the successive images to be received thereon separately and in a single-line sequence. According to his view, the scope of the second claim is identical with that of the first, except that it is limited to a single camera, with a single lens, as the means for protecting the images onto the sensitized surface, and the third claim differs from the second only in that it is restricted to the intermittent movement of the film, and to the exposure of the film during the periods of rest. We think this interpretation of the claims is the reasonable one, and the question of their validity is to be determined by giving to them this scope."

The claims of the reissue read as follows:

"(1) An apparatus for taking photographs suitable for the exhibition of objects in motion, having in combination a camera having a single stationary lens; a single sensitized tape-film supported on opposite sides of, and longitudinally movable with respect to, the lens, and having an intermediate section crossing the lens; feeding devices engaging such intermediate section of the film and moving the same across the lens of the camera at a high rate of speed and with an intermittent motion; and a shutter exposing successive portions of the film during the periods of rest, substantially as set forth.

"(2) An apparatus for taking photographs suitable for the exhibition of objects in motion, having in combination a camera having a single stationary lens; a single sensitized tape-film supported on opposite sides of and longitudinally movable with respect to, the lens, and having an intermediate section crossing the lens; a continuously-rotating driving-shaft; feeding devices operated by said shaft engaging such intermediate section of the film and moving the same across the lens of the camera at a high rate of speed and with an intermittent motion; and a continuously-rotating shutter operated by said shaft for exposing successive portions, of the film during the periods of rest, substantially as set forth.

"(3) An apparatus for taking photographs suitable for the exhibition of objects in motion, having in combination a camera having a single stationary lens; a single sensitized tape-film supported on opposite sides of, and longitudinally movable with respect to, the lens, and having an intermediate section crossing the lens; a continuously-rotating driving-shaft; feeding devices operated by said shaft engaging such intermediate section of the film and moving the same across the lens of the camera at a high rate of speed and with an intermittent motion; a shutter exposing successive portions of the film during the periods of rest; and a reel revolved by said shaft with variable speed for winding the film thereon after exposure, substantially as set forth.

"(4) An apparatus for taking photographs suitable for the exhibition of objects in motion, having in combination a single camera, and means for passing a sensitized tape-film across the lens at a high rate of speed and with an intermittent motion, and for exposing successive portions of the film during the periods of rest, the periods of rest being greater than the periods of motion, substantially as set forth."

Claim 3 of the original patent reads:

"An apparatus for taking photographs suitable for the exhibition of objects in motion, having in combination a single camera, and means for passing a sensitized tape-film across the lens of the camera at a high rate of speed, and with an intermittent motion, and for exposing successive portions of the film during the periods of rest substantially as set forth."

This was a claim for an apparatus for taking photographs suitable for the exhibition of objects in motion, having in combination (1) a single camera; (2) means for passing a sensitized tape-film across the lens of the camera, a, at a high rate of speed, and, b, with an intermittent motion; and (3) means (the same) for exposing successive portions of the film during the periods of rest; and (4) all, substantially as set forth.

Reissued claim 1 is for the same kind of an apparatus suitable for the same purpose, and has in combination (1) a camera having a single stationary lens; (2) a single sensitized tape-film supported on opposite sides of, and longitudinally movable with respect to the lens, and having an intermediate section crossing the lens; (3) feeding devices, a, engaging such intermediate section of the film, and, b, moving the same across the lens of the camera, a, at a high rate of speed, and, b, with an intermittent motion; (4) a shutter exposing successive portions of the film during the periods of rest; and (5) all, substantially as set forth.

The original claim 3 neither describes the tape-film nor its mode of support with respect to the lens. So far as the mere reading of the claim itself is concerned (omitting the words "substantially as set forth") the tape-film might "dangle" or hang loosely across the lens and pass it by successive jerks, it being supported at one end only. Taken with the drawings and specifications, it is evident it was supported substantially as described in the reissue, and had the "intermediate section crossing the lens." In original claim 3 the "means" for passing the tape-film were not limited. It might be done possibly by pulling or pushing or by engaging the edges with something that would carry it along, and such engagement might be at any point. In reissued claim 1 the "means" are limited to "feeding devices engaging such intermediate section of the film," the section opposite the lens. The "shutter" is added. In the reissued patent the feeding device or "means" for moving the film engage the same at a particular place or portion thereof. Comparing these claims, 1 of the reissue and 3 of the original patent, we have added specified elements. But was the camera of the original letters without a shutter for the lens? I think that in machine cameras having an intermittent motion shutters are a matter of course. I think "a camera having a single stationary lens" is the same as "a single camera," and that a "single sensitized tape-film" is "a tape-film." The Circuit Court of Appeals had before it and considered the apparatus of both Marey and Levison, and each had the single lens only.

Defendant's counsel, in considering the validity of claim 1 of the reissued patent, says, in substance, that the issue resolves itself into the question whether "in a camera, otherwise old, the engagement of the feeding devices with the film itself, instead of with the supports for the film, was novel and patentable" by the complainant. In considering the original patent, Judge Wallace said:

"The important question is whether the invention was in such sense a primary one as to authorize the claims based upon it. The general statements in the specification imply that Mr. Edison was the creator of the art to which the patent relates. And the descriptive parts are carefully framed to lay the foundation for generic claims which are not to be limited by importing into them any of the operative devices except those which are indispensable to effect the functional results enumerated. It will be observed that neither the means for moving the film across the lens of the camera, nor for exposing successive portions of it to operation of the lens, nor for giving it a continuous or intermittent motion, nor for doing these things at a high rate of speed, are specified in the claims otherwise than functionally. Any combination of means that will do these things at a high enough rate of speed to secure the result of persistence of vision, and which includes a stationary single lens and tape-like film is covered by the claims.

"It is obvious that Mr. Edison was not a pioneer in the large sense of the term, or in the more limited sense in which he would have been if he had also invented the film. He was not the inventor of the film. He was not the first inventor of apparatus capable of producing suitable negatives, taken from practically a single point of view, in single-line sequence upon a film like his, and embodying the same general means of rotating drums and shutters for bringing the sensitized surface across the lens and exposing successive portions of it in rapid succession. Du Cos anticipated him in this, notwithstanding he did not use the film. Neither was he the first inventor of apparatus capable of producing suitable negatives and embodying means for passing a sensitized surface across a single lens camera at a high rate of speed and with an intermittent motion, and for exposing successive portions of the surfaces during the periods of rest. His claim for such an apparatus was rejected by the patent office, and he acquiesced in its rejection. He was anticipated in this by Marey, and Marey also anticipated him in photographing successive positions of the object in motion from the same point of view.

      *       *       *       *       *       *       *

"We conclude that the functional limitations which are inserted in the claims do not restrict the patent to the scope of Mr. Edison's real invention. We cannot undertake to point out the differences between the scope of the real invention and the claims. The real invention, if it involved invention as distinguished from improvement, probably consists of details of organization, by which the capacity of the reels and moving devices are augmented and adapted to carry the film of the patent rapidly and properly. It suffices to say that the modifications required to conform old apparatus to the use of the tape-film, and which would define the real invention, cannot be imported into the first and third claims without violence to their terms; and the second claim is broader than the third."

The court also declared, in substance, that during the transition from the use of plates to the sensitized films now in use, the predecessors of this complainant invented apparatus capable of producing negatives suitable for reproduction in exhibiting machines; that "no new principle was to be discovered, or essentially new form of machine invented, in order to make the improved photographic material available for the purpose"; that early inventors had either contented themselves with such measures of success as were possible with the material at hand, or had allowed their plans to remain on paper as "indications of the forms of mechanical and optical apparatus which might be used" when suitable films became available. In other words, the court indicates that the development of apparatus was ahead of the film of the present day and already designed in anticipation of it. The court then says:

"They had not perfected the details of apparatus especially adapted for the employment of the film of the patent, and to do this required but a moderate amount of mechanical ingenuity."

Then followed the conclusion, before quoted, containing the words:

"The real invention, if it involved invention as distinguished from improvement, probably consists of details of organization, by which the capacity of the reels and moving devices are augmented and adapted to carry the film of the patent rapidly and properly."

In the quotation already made we find this:

"Neither was he the first inventor of apparatus capable of producing suitable negatives and embodying means for passing a sensitized surface across a single lens camera at a high rate of speed and with an intermittent motion

and for exposing successive portions of the surfaces during the periods of rest. His claim for such an apparatus was rejected by the patent office," etc.

In view of these declarations by the court, made after a careful consideration of the prior art and Edison's work and patent, it must be conceded that complainant's invention, if there be one, is very narrow. If "but a moderate amount of mechanical ingenuity" was required to perfect the details of apparatus already designed and made public property by publication, and otherwise, it is pertinent to inquire whether Edison had done anything that amounts to invention. It seems to be conceded that in this art all prior apparatus had moved the film, or provided for moving it, or the plates, across the lens by attaching it to the supports of the film; that is, the film was handled in and of itself by the mechanism which grasped and held or controlled the film consisting of the rolls upon which it was wound, controlled by gears. As these rolls moved, the film was fed along in front of the lens. Edison has a specific form of feed controlling mechanism which engages directly with the film, and carries a certain portion of it along a certain distance, then allowing it to rest, or remain stationary, a short time in front of the lens while the impression of the moving object being photographed is being taken, and then moves another portion in front of the lens. This continues indefinitely, or so long as the machine is in motion and the film holds out. There is a slack portion of the film, given off by the delivery roll, always ready to be taken up by this feed controlling mechanism and passed in front of the lens. The receiving roll does not partake of the intermittent motion. Between the delivery roll and the feeding device there is a stationary guide to prevent the flapping or buckling of the film. The driving shaft rotates continuously, but by means of a slipping belt connecting the receiving roll with a continuously rotating pulley the receiving or take up roll takes the impressed or printed film so fast only as it is ready to be moved thereon.

In view of the prior art, the great problem was one of speed, variable speed, corresponding with the rapidity of the movements of the object to be photographed, accompanied by accuracy. The mechanism for holding and moving the film must work smoothly, accurately, and rapidly. There must be no trembling or jerky appearance in the reproduced pictures. Each impression must be clean cut and well defined. I think the device of the complainant a great advance in the prior art and that invention is disclosed. Has Edison copied or followed the prior art or simply adapted some prior mechanism in the same or an analogous art to the art of photographing objects in rapid motion? The Gordon patent, 18,545, the Kelly patent, 353,312, the Eckerson patent, 387,500, the Schlotterhoss patents, the Urie patents, and the Waterbury patent, 133,394, are cited. They have been carefully examined. Undoubtedly Edison had them in mind in devising his apparatus, but I am not satisfied that these anticipate his device or that with them before him his apparatus is devoid of invention. Nor do I think claims 1, 2, and 3 of the reissue are necessarily broader than his invention warrants. The Patent Office must have had the decision of the Circuit Court of Appeals in mind in granting

the reissued letters patent. These claims, in view of the prior art, must be narrowly construed, however, when we come to consider the question of infringement.

As to claim 4 of the patent in suit, I think it void, as too broad. True, it was not in issue, or directly passed upon, in the case referred to, but I think it condemned by the reasoning in that case. The only change from what was condemned by the Circuit Court of Appeals seems to be in the insertion of the words "the periods of rest being greater than the periods of motion." This, to my mind, is too vague and uncertain. Indeed, I have some doubts as to the validity of the other claims but do not think the presumption of validity arising from the grant is overcome.

Coming to the question of infringement there is not a little difficulty. I do not think complainant entitled to a monopoly of all feeding devices operated by a continuously rotating driving shaft engaging a portion of the film intermediate the delivery roll and the receiving roll and which move the film across the lens of the camera at a high rate of speed and with an intermittent motion. He is not entitled to have his claims so construed. While there are features of construction and principles of operation common to both the complainant's device and those used by defendant, these are old and may be used by any one. Complainant's camera, or apparatus, has a delivery roll or supply spool, a receiving roll and a sprocket wheel or feeding device giving to the film the intermittent motion which engages with perforations in the film at a point intermediate the supply and receiving rolls. It also has a stationary guide for the film already referred to. This sprocket wheel is rotated by a counter shaft by means of a belt and its engagement with a notched wheel on the main shaft imparts the intermittent motion. The receiving roll is moved by a counter shaft which is put in motion by the main shaft through the instrumentality of beveled gears and a belt. In defendant's apparatus, biograph camera, we find both the delivery and the receiving rolls and also a guide to prevent flapping or buckling. The film is drawn from the delivery roll by a constantly driven roller and a presser roller, between which it passes, and by means of which the film is constantly or continuously drawn from the delivery roll. Here is found a loop or slack of the film. The film then passes to a stationary guide, where we find what complainant calls a vibrating punch, and what defendant terms a clamp. This serves to hold fast and let loose the film as it is drawn past the lens by two rolls or pulleys on the other side. These rolls would move the film continuously, but for the clamp or vibrating punch. When the clamp or punch is raised from contact with the film the rolls last mentioned draw the film forward, but when the punch or clamp drops into contact with it the forward movement of the film is arrested, that is, stops. This gives the intermittent motion or movement to the film. This feeding device is essentially different from the sprocket wheel device of complainant's patent. In each of the claims 1, 2, and 3 the feeding device engages the intermediate section of the film crossing the lens. The essential feature of this feeding device is the sprocket wheel which actually engages the film, and carries it along with an intermittent

motion. The essential feature of the feeding device in the biograph camera is the two rolls which draw or pull the film across the lens co-acting with the vibrating punch or clamp on the opposite side. These mechanical devices for accomplishing the desired purpose are essentially different. I find no infringement in the use of the biograph camera. It is unnecessary to describe the movement of the film after passing the two rolls that serve to draw it past the lens. In defendant's Warwick camera we have a very different feeding device.

We have the delivery roll and the receiving roll which are common to all three of the cameras described. The film, after coming from the delivery roll, passes between two rollers; one of which is constantly rotating, and engages with perforations in the edges of the film, the other being an idle or presser roller. As the film passes from these rollers, a loop of slack film is formed, and this, as it is taken up by the feeding device proper, passes through a stationary guide, which serves to prevent flapping or buckling, and then is drawn past the film by a sort of rake which is dropped against and engages with the film, and then is raised. This gives the intermittent motion to the film, a period of rest and a period of movement. After passing the rake tooth or teeth, the film is slack, and forms what is called a loop, and this slack is taken up, and carried forward towards the receiving roll by a roller which engages it and an idle or pressing roller, and then the film is taken up by the receiving roll which does not partake of the intermittent motion. It will be seen that the essential element of this feeding device is the rake which, when engaged with the film, serves to draw it forward. It is not the vibrating punch or clamp of the biograph which served to stop the movement of the film. It does, however, engage with and draw forward the film, and so does the sprocket wheel of the complainant's patent. Says the patent as to the advancement of the film:

"Referring to the drawings, 3 indicates the transparent or translucent tape-film, which, before the apparatus is put in operation, is all coiled on a reel in the sheet-metal box or case 1; the free end being connected to an empty reel in the case 2. The film, 3, is preferably of sufficient width to admit the taking of pictures one inch in diameter between the rows of holes, 4. Fig. 2, arranged at regular intervals along the two edges of the film, and into which holes the teeth of the wheels, 5, Figs. 1 and 2, enter for the purpose of positively advancing the film. When the film is narrow, it is not essential to use two rows of perforations and two feed-wheels, one feed-wheel being sufficient. Said wheels are mounted on a shaft, 6, which carries a loose pulley, 7; that is, a pulley frictionally connected to its shaft and forming a yielding mechanical connection. This pulley is driven by a cord or belt, 8, from a pulley, 9, on the shaft, 10, which shaft is driven by means of the beveled gears, 11, 12."

And, as to bringing it to a rest:

"The shaft, 6, heretofore referred to, is provided with a detent or stop-wheel, 23; the form of which is most clearly shown in Figs. 3 and 4. The wheel, 23, is provided with a number of projecting teeth, 24, six being shown, which teeth are adapted to strike successively against the face of the cooperating detent or stop-wheel, 25, on the shaft, 26, which is the armature-shaft of the motor or a shaft which is constantly driven by the motor. The wheel, 25, has a corresponding number of notches, 27, at regular intervals around its periphery. These notches are of such size and shape that the teeth, 24, can pass through them, and when the wheels, 23 and 25, are rotated in the direction indicated by the arrows, each tooth in succession will strike the face

of wheel, 25, thereby bringing the film absolutely to rest at the same moment that an opening in the shutter exposes the film, and will then pass through a notch, allowing the tape-film to be moved forward another step while it is covered by the shutter. To avoid the danger of the wheel, 25, moving so quickly that a tooth cannot enter the proper notch, a laterally-projecting tooth, 29, is provided adjacent to each notch. When a tooth, 29, strikes a tooth, 24, the latter tooth will be guided by the tooth, 29, into the adjacent notch, 27."

As the feeding devices of defendant's Warwick camera are different in principle and mode of operation from complainant's, and as complainant must be confined to the specific feeding devices specified, described and set forth, the defendant does not infringe.

Defendant is entitled to a decree dismissing the bill.