HOLMES ELECTRIC PROTECTIVE Co. *v.* METROPOLITAN BURGLAR ALARM Co.

(*Circuit Court, S. D. New York.*    December 31, 1887.)

1. PATENTS FOR INVENTIONS—INVENTION—ELECTRIC SAFE-LINING.
    In an action for the infringement of letters patent No. 120,874, for an improvement in electric linings for safes, it appeared that the alleged invention consisted in placing the electrical apparatus on the outside of the safe, instead of the inside, as had been done long before the patent was obtained.    *Held,* that it was not an invention merely to find a new position for the electric lining, the device remaining the same.

2. SAME—ABANDONMENT—DESCRIPTION IN FORMER PATENT.
    In an action for the infringement of letters patent No. 120,874, for an improvement in the electric lining of safes, it was conceded that every feature of the patent had been described in a patent issued the year before to the same patentees, though not included in the claims therein.    There were no

words of reservation in the former patent. *Held*, that this was an abandonment of those features to the public, which could not be reclaimed, and a patent subsequently granted, covering them, is invalid.

3. SAME—ANTICIPATION—ELECTRIC SAFE-LINING.
   In letters patent No. 120,874, for an improvement in electric linings for safes, the plaintiff claimed "a safe or vault provided with an electric outer lining surrounding or covering it," etc. A patent issued a year before to the same patentees contained a claim for "the combination of an electric envelope or lining for safes, vaults, and other structures with an instrument," etc. *Held*, that the claim of the later patent is covered by the claims in the former patent, and expired with it.

4. SAME—DURATION—FOREIGN PATENT—IMPROVEMENT.
   Plaintiff took out a patent in England for an improvement in electric linings for safes. Subsequently a patent was taken out for substantially the same device in America. Whether the American patent expired with the English patent, even though it contained some additional improvements, in view of *Insurance Co.* v. *Sellers*, 8 Sup. Ct. Rep. 117, *quære.*

In Equity. Action for infringement of patent.

*S. A. Duncan*, for complainant.

*G. G. Frelinghuysen*, for defendant.

COXE, J. The defendant is charged with infringing letters patent No. 120,874, granted November 14, 1871, to Edwin Holmes and Henry C. Roome, for an improvement in electric linings for safes. The alleged invention consists in placing the electrical apparatus on the outside instead of on the inside of the safe. The claims are as follows:

"(1) A safe or vault provided with an electric outer lining surrounding or covering it wholly or in part, and insulated therefrom, and protected, substantially as herein shown and specified.

"(2) The exterior inclosure, B, made of the parts *b* and *c*, substantially as herein shown and described, to be applied to a safe or vault in the manner specified."

The defenses are—*First*, lack of novelty and invention; *second*, that the invention is fully described and claimed in a prior patent to the same patentees; *third*, that the patent expired with the expiration of a prior English patent for the same invention. Infringement is not disputed.

Prior to the patent it was old to protect articles of value by electricity. Buildings and rooms had been protected by placing the conductors of electricity on the outside, and safes had been protected by placing them on the inside. This being the state of the art, these patentees erected around the safe or structure to be guarded an exterior case of wood or *papier mache*, to the inside of which is attached the electrical lining, or it may be applied to the surface of the safe proper, without the use of an outer casing. In other words, the essence of the invention is the new position given to the old electrical apparatus, without any reference to the special manner in which such apparatus is constructed. It is by no means important that the appliances described in the specification be used; any "electric lining" located on the outside of the safe is within the claims. As counsel and experts all concur in the foregoing interpretation, it is safe to start with the proposition that the invention relates only to the position given to the old apparatus; its essential feature being the change in the location of the protective lining from the inside to the

outside of the safe. Was it invention to do this? An examination of the decisions pronounced in analogous cases will aid in the proper determination of this question.

In *Railroad* v. *Truck Co.*, 110 U. S. 490, 4 Sup. Ct. Rep. 220, it was held not to be invention to place a swiveling truck, previously used on cars, under the forward end of a locomotive. In *Harwood* v. *Railway Co.*, 11 H. L. Cas. 654, no patentable novelty was found in the substitution of the fish-plate joint for the dangerous chair joint previously in use, similar plates having been used on bridge timbers. The men who made these changes introduced into the art of railroading improvements the great value of which is unquestioned. A railroad operated without them now would be regarded as a curious relic of forgotten years, and yet the men whose ingenuity created this revolution were refused patents because they simply placed old devices in new situations, without change of result. In *Stephenson* v. *Railroad Co.*, 114 U. S. 149, 5 Sup. Ct. Rep. 777, it was held not to involve invention to attach a mirror to the front hood of a street car, so that the driver, without turning around, could see the interior of the car, although no one had ever employed a mirror in this manner, on a street car, before. In *Bush* v. *Fox*, 38 Law & Eq. Rep. 1, the patentee sought protection for an ingeniously constructed caisson by which workmen, under the surface of water, were supplied with fresh air; but the same contrivance had been used under the surface of land in a similar way, and patentability was denied. In *Hailes* v. *Stove Co.*, 8 Sup. Ct. Rep. 262, (Sup. Ct. Dec. 12, 1887,) Mr. Justice BRADLEY says: "But we fail to see that any inventive power was required to apply the same fire-pot to a different kind of circular stove. That no invention was required seems to us too plain for argument." So the supreme court has decided that it did not require an exercise of the inventive faculty to place a dredging screw in the stem of a boat which had previously been located in the stern, (*Atlantic Works* v. *Brady*, 107 U. S. 192, 2 Sup. Ct. Rep. 225;) or to preserve meats and fruits by a process which had been similarly used in connection with other perishable substances, (*Brown* v. *Piper*, 91 U. S. 37;) or to transfer a fuel magazine used in stoves to a fire-place heater, (*Heating Co.* v. *Burtis*, 121 U. S. 286, 7 Sup. Ct. Rep. 1034.) See, also, *Miller* v. *Foree*, 116 U. S. 22, 6 Sup. Ct. Rep. 204; *Pomace-Holder Co.* v. *Ferguson*, 119 U. S. 335, 7 Sup. Ct. Rep. 382, and cases cited.

The rule deducible from these authorities, and many others that might be cited, is that it is not invention, the subject being the same, to find a new position for an old device, unless there is substantial difference in the manner of its operation, and some new and useful result is produced. The new application may be an unquestioned improvement upon the prior art, and supersede it in the market. The machine may work faster and better in the new position, and yield a larger product, the result may be in every way more satisfactory; nevertheless, if it be in fact the old machine or combination working in substantially the old way, and producing substantially the same result, there is nothing of which to predicate patentability.

In order to obtain a correct estimate of the patent in suit it is wise to keep these rules in view, and also to divest the mind of the idea that there was anything mysterious or unusual in changing the location of an "*electric* lining," as distinguished from other protective linings then in use. The notion of guarding the safe itself, as well as its contents, was undoubtedly a clever one; but an abstract idea, apart from the plan adopted for carrying it out, is not patentable. The plan adopted in this instance was the transposition of the electrical conductors from the inside to the outside of the safe. The apparatus being old, it required no more ingenuity to accomplish this than to change a lining of iron or steel or asbestos in a similar manner. Safe-alarms may be operated in many ways; for instance, by the escape of water, air, or steam confined within the outer wall of the safe. Mechanical skill might be needed to change the location of such water, air, or steam chamber, but nothing else. The patentees took a lining out of an iron box and put it into a wooden or paper box. Did they do more?

Let it be assumed that a new fire-proof and burglar-proof material, composed, for instance, of a combination of chrome-iron and vitreous wool, has been discovered and placed by the inventor on the inside of a safe. Can it be that another party who, for the first time, places this lining on the outside of a safe, can thereafter, by means of a patent, prevent all persons from using it when located in that position? Or, to push the simile one step further, would it be patentable novelty to make a top-coat of material which had hitherto been used only as a chest-protector or as a lining for waistcoats? It should always be remembered that these patentees are not seeking to secure their own peculiar and ingenious mechanism. They wish to treat as infringers all who by the use of their electrical apparatus, or any other, protect the outside of a safe or vault. The complainant's expert witness understands that the covering should fit the safe "closely," but the claims are comprehensive enough to cover an exterior case many times larger than the safe which it incloses. It is, at least, a question whether a banker who at night should roll his office safe into a vault, protected on the inside by an electric lining, would not infringe the claims. A merchant who should ask an electrician how he could protect the contents of his safe not only, but the safe itself, from burglars, would receive the spontaneous answer, "Place it inside an electric lining." The merchant would be entitled to credit, perhaps, for a practical suggestion, but what of the mechanic who simply arranged the old apparatus in the old way around the new article to be guarded?

There is no pretense that there is the slightest change in the manner in which the conductors operate in the new position. Why should the patentees be permitted to pre-empt this particular location as exclusively their own? That they at one time entertained these views may be inferred from the fact that in their patent of 1870 they make the location of their apparatus, whether on the inside or on the outside of the safe, wholly optional, and do not specifically claim it in either position.

I have thought it proper to refer to this subject at some length, because

it has been discussed by counsel, and it surely is one of the crucial questions in the case; and yet I should hesitate to declare the patent invalid upon this ground alone, for the reason that the able and careful judge who heard the motion for an injunction found with the complainant upon this issue.

But the questions arising under the patent of 1870 were brought to the attention of the judge at so late a day that he declined to pass upon them, except in a *pro forma* manner, and, quite properly, continued them to the final hearing.

On the twentieth of December, 1870, nearly a year prior to the patent in suit, Holmes and Roome, the patentees, were granted a patent for "an improvement in electro-magnetic *envelopes* for safe-vaults," etc., in which the arrangement now under discussion is fully described. In the specification they say:

"Figure 1 represents an interior face view of our improved *envelope* or lining, as applied to the one side of a safe or vault, *or wooden case inclosing the same.*"

And again they say that the apparatus "may be applied in the form of a single sheet as *an envelope* or lining to a safe, vault, or other structure, *or to the inside of a wooden covering surrounding the same.*" The effect of making " an *envelope* or lining" an element of three of the four claims will be considered later on. It is conceded that every feature of the patent of 1871 is described in the patent of 1870. This description was given to the world in December, 1870, without a word of reservation. If the use of the electric envelope on the outside of the safe is not covered by the claims of the first patent it clearly might have been.

This is not the case of a patentee who has made application for the second patent before the first is issued. It would be manifestly unfair to hold him responsible for the action of the patent-office in this regard. Nor is it the case of a patentee who is compelled to disclose his second invention in order to describe the first intelligibly, the two being distinct and not the proper subject of a single patent; though in the latter case it would seem that he should adopt some means to protect himself and warn the public. The proposition which the court here decides is that where a patent fully describes an invention which could be claimed therein, and makes no reservation, and gives no warning to the public, a second patent, granted upon an application filed months afterwards, which claims simply and solely the invention thus made public, is invalid. It is freely conceded that there is a wide diversity of opinion upon this question, but it is thought that the weight of authority sustains the foregoing proposition. The language of the court in *Mahn* v. *Harwood*, 112 U. S. 354, 5 Sup. Ct. Rep. 174, is hardly susceptible of two interpretations. It seems very plain and unequivocal. At page 360 the court says:

"The taking out of a patent which has (as the law requires it to have) a specific claim, is notice to all the world, of the most public and solemn kind, that all those parts of the art, machine, or manufacture set out and described in the specification, and not embraced in such specific claim, are not claimed

by the patentee; at least not claimed in and by that patent. If he has a distinct patent for other parts, *or has made application therefor, or has reserved the right to make such application,* that is another matter, not affecting the patent in question. \* \* \* The public is notified and informed by the most solemn act on the part of the patentee that his claim to invention is for such and such an element or combination, and for nothing more. *Of course, what is not claimed is public property.* The presumption is, and such is generally the fact, that what is not claimed was not invented by the patentee, but was known and used before he made his invention. But, whether so or not, his own act has made it public property if it was not so before. The patent itself, as soon as it is issued, is the evidence of this."

How can language be more perspicuous? The opinion then proceeds to consider how, in case of mistake, the patentee may, in some instances, reclaim what he has thus given up under the equitable provisions relating to reissues. The theory that the patentee could retake the property of the public by means of a new patent thereafter to be applied for does not seem to have occurred to the accomplished jurist who spoke for the court upon that occasion. See, also, *Campbell* v. *James*, 104 U. S. 356; *Miller* v. *Bruss Co.*, Id. 350; *Coon* v. *Wilson*, 113 U. S. 268, 5 Sup. Ct. Rep. 537; *Adams* v. *Stamping Co.*, 28 Fed. Rep. 360, 365; *Railway Reg. Co.* v. *Broadway Co.*, 26 Fed. Rep. 522; *Needle Co.* v. *Needle Co.*, 23 Blatchf. 147, 32 Fed. Rep. 221; *Hill* v. *Commissioner Patents*, 33 O. G. 757; *Marvin* v. *Lillie*, 27 O. G. 299; *Swift* v. *Jenks*, 29 Fed. Rep. 642; *Ex parte Long*, 25 O. G. 1189; *Ex parte Rohn*, Id. 1190.

The people, in a sense, are parties to every patent. It is dealing most unfairly with them to inform them in this solemn manner what they may do with impunity, and, months afterwards, retract what was said, and retake what was given up. When a patentee describes two devices and claims one, it is tantamount to an affirmative declaration that he does not claim the other. Can it be that a person who, in 1870, purchased an electric lining of Holmes and Roome and applied it in precise accordance with Figure 1 and the description of the patent of that year, could, 12 months afterwards, be compelled to pay tribute as an infringer? The statute should not, and, it is thought, does not, permit such an anomalous state of things.

If the invention is not abandoned when it is voluntarily and unreservedly described and not claimed, when does it become so? After two years, it is said. But why? A description of this character in a prior patent is by no means proof that the patented device has been "in public use or on sale for more than two years prior to his application." The statute does not provide that the abandonment shall continue for two years; it does not say that when a person has by express terms given his invention to the public he shall have two years in which to take it back again. When, therefore, it is once established that the invention has been given up and belongs to the public, there is an end of the controversy so far as a new patent is concerned. What statute gives the inventor the right to reclaim it? Not the reissue section, surely. This is not the case of a reissue. That section has little application to the present circumstances. Besides, there is no pretense that the patentees were

misled, or that any act of theirs occurred through inadvertence, accident, or mistake. They deliberately gave to the public in 1870 what they did not claim, and in 1871 they attempted, without a word of explanation or suggestion of mistake, to repossess it.

So the simple question here would seem to be: Has dedication to the public been proved? To this question the supreme court has over and over again given an affirmative answer, holding that abandonment is established by just the facts which the record in this cause presents. The learned counsel for the complainant quotes from *Parker & Whipple Co.* v. *Clock Co.*, 8 Sup. Ct. Rep. 38, as follows:

"There is no evidence of any attempt to secure by the original patent the inventions covered by the first eight claims of the reissue, and those inventions must be regarded as having been abandoned or waived, so far as the reissue in question is concerned, subject, however, to the right to have made a new application for a patent to cover them; in other words, those eight claims are not for the same invention which was originally patented."

This language should be read in connection with the paragraph which almost immediately precedes it, and which contains these words:

"The description set forth in that specification as the foundation for the first eight claims in it, and those eight claims themselves, might have been the subject of another application for a patent, *at the time the original patent was applied for and taken out.*"

It is, of course, admitted by the complainant that if the invention was patented in 1870 the patent at bar is invalid.

As has been seen, the essence of the invention is the outside position, and there is great plausibility in the argument that this feature is covered by the claims of the patent of 1870. Take for instance the second claim:

"The combination of an electric envelope or lining for safes, vaults, and other structures, with a galvanometer or instrument, the movements of which are produced by variation in a current of electricity from a battery or other electrical apparatus, in connection with a safe vault, or structure, substantially as herein described."

A reference to the description removes all doubt that the word "envelope" in this claim refers to the apparatus when placed on the outside of the safe. The first patent claims the apparatus both on the outside and inside; the second, on the outside only. But that the outside position is referred to, suggested, and described in the claims of the earlier patent, and, so far as the present question is concerned, covered by those claims, there can be little doubt. It is true that the claims of the patent in hand take a much wider range, but is not every element thereof found in the claims of the prior patent; in other words, did not the patentees attempt by the second patent to claim the same invention more broadly? The recent case of *Insurance Co.* v. *Sellers*, 8 Sup. Ct. Rep. 117, (Sup. Ct., Nov. 14, 1887,) may be referred to as bearing upon this question, and also as bearing, with perhaps greater force, upon the defense founded upon the expiration of the English patent. In that case the court say:

"It is contended by the counsel of the complainants that the American patent contains improvements which are not exhibited in the English patent.

But if this were so, it would not help the complainants. *The principal invention is in both;* and if the American patent contains additional improvements, this fact cannot save the patent from the operation of the law which is invoked, if it is subject to that law at all. A patent cannot be exempt from the operation of the law by adding some new improvements to the invention, and cannot be construed as running partly from one date and partly from another. This would be productive of endless confusion."

It follows that there must be a decree dismissing the bill, with costs.