## INGERSOLL et al. v. DELAWARE & HUDSON CO.

Circuit Court of Appeals, Second Circuit.
January 13, 1930.

No. 78.

466

Charles Neave, H. T. Newcomb, and Clarence D. Kerr, all of New York City, for appellant.

Redding, Greeley, O'Shea & Campbell, of New York City (H. L. Lechner and Paul Synnestvedt, both of Philadelphia, Pa., and William A. Redding, of New York City, of counsel), for appellees.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge. ▪ The District Court found claim 32 of the patent to Ingersoll, No. 1,339,395, claims 16 and 17 of Ingersoll patent, No. 1,383,633, and claims 16, 17, and 21 of Ingersoll patent, No. 1,547,-155, valid and infringed in these suits for infringement of four patents. There were a number of other claims sued on, but, since the plaintiffs have not appealed from the disallowance of such claims as infringed, it is unnecessary to consider them here.

The patents relate to improvements in auxiliary or booster engines used to aid railroad locomotives in starting, or while running at low speeds. The appellant's auxiliary engine is used on the engine tender and is of two forms. The appellees' is a small steam engine mounted on the idle axle on a truck directly under the locomotive cab. A gear is put on the axle, and a driving engagement, with other gears connected with the booster engine, is caused to move by the control system. To make safe operation, the booster controls cannot operate except when the engine throttle has been opened to permit steam to reach the engine cylinders, and when the usual reverse lever, controlling the valves for admitting steam in the main engine cylinder, is placed in an operating position by the hand of the engineer. When the main throttle and reverse lever have been placed in such position, the movement of a latch causes the booster control mechanism to operate automatically to entrain the gears connecting the booster engine and the axle, and then steam is turned into the booster engine, and this brings it into control. This control mechanism is operated by an air pressure system, in which the valve or booster throttle, which admits steam into the cylinder of the booster engine, cannot be open, unless the main throttle is opened, and unless, also, the reverse lever is in its full forward position engaging the booster latch, and, with the reverse lever in such position, the air controls must move the gearing connected with the booster engine into engagement with the gear on the truck axle, and also then moving the booster throttle into position to admit steam to the booster engine, which thereupon begins to revolve and drive the axle on the booster truck. Such action, however, cannot take place until the main throttle is open and the reverse lever is in a forward position, as stated. The patents in suit have complicated organized systems with a multiplicity of automatic devices, and the operation is dependent upon the manipulation of the reverse lever of the locomotive to a certain position.

The patents in suit used saturated steam in the early installations, and the condensation losses from saturated steam were so material as to render very desirable the location of the auxiliary engine as near as possible to the source of steam, and this made the location of the booster under the locomotive advantageous. Because of thus so locating the booster, problems arose for its accommodation in the limited space at the back end of the locomotive, under the fire box and framed extensions. But problems of this kind were common to clutching devices where power is used.

Both the appellant and the appellees have combined old elements for the same function in different ways. The appellant's principle of operation is old. It admits steam to the auxiliary engine only while steam is being admitted to the main engine, and it causes the auxiliary engine to be operated solely while it is being put into operative connection with the axle to exert a tractive effect, and then to operate with full force.

In 1876, Cruezbaur (patent No. 173,164) conceived an arrangement for an auxiliary engine which was coupled only when the power of the other engine was insufficient, and provided a clutch which coupled the auxiliary engine to the axle, to be driven when the engine starts in operation. Evans, in his patent of 1915 (No. 1,136,947), provided an auxiliary engine for starting when the load was excessive, or when ascending steep grades. In the Evans booster, the main throttle controls the admission of steam to the auxiliary engine cylinders, as well as to the main engine, but the pipe leading from the throttle valve to the auxiliary engine is equipped with a valve by means of which the supply of steam to the booster engine may be

controlled and cut out when desired. The auxiliary engine shaft is geared to the axle gear by means of a pair of gear wheels, which alternately are brought into engagement with the axle gear by means of a gear shaft lever, which acts, not only as a gear-engaging lever, but also as a booster-reversing lever. Thus there is disclosed by the Evans patent a structure in which steam can be admitted to the auxiliary engine only when it is being admitted to the main engine, and in which gears driven by the booster engine are caused to mesh with the axle gear of the trailer truck when it is desired to use the booster engine, and are disengaged when driving by the booster engine is discontinued.

Cruezbaur's patent showed the sequence of operation. The arrangement is such that the booster engine can have steam supplied to it only when and if steam is being supplied to the main engine, and the auxiliary engine is clutched to the shaft, to be driven almost simultaneously with the beginning of the operation of the auxiliary engine. This is similar to the sequence of operation in the appellant's system. In it steam cannot be admitted to operate the booster engine, unless steam is at first flowing into the main engine and unless the clutch has been set for connecting the auxiliary engine to the shaft in its drive. Thus, there was an auxiliary engine and its mechanism for connecting it with the normally idle axle under the control of the throttle lever. Moreover, Cruezbaur solved the difficulty of butting teeth or lugs between the engaging members of the clutch, which might prevent engagement of the clutch, by providing a spring which would snap the clutch into place as soon as the auxiliary motor shaft began to revolve.

The same idea is disclosed in the Helmholtz patent, No. 516,436. The admission of steam in the Helmholtz auxiliary engine was under the control of the main valve, and, as in appellant's structure, had a main throttle and auxiliary throttle. The Stuller patent of 1912, No. 1,032,516, shows an internal combustion engine which is started by means of an auxiliary engine operated by compressed air stored in a tank. When it is desired to start the auxiliary engine and engage the gear clutch, compressed air from the tank enters the cylinder and forces the piston to the right, to engage or mesh the gear, and at the same time a small quantity of air will pass through the pipe to the cylinders and the auxiliary engine, to start the latter slowly. Thus there was known to the art the principle of operation of admitting steam to the auxiliary engine only while steam was being admitted to the main engine, and causing the auxiliary engine to be operated slowly, while it was being put into operative connection with the axle to exert a tractive effect, and then to operate with full force.

In this state of the art, appellees' patents appeared. The three patents in suit do not admit or contemplate the possibility of putting an auxiliary engine under the tender. Ingersoll's patent, No. 1,547,155, was the first to issue; an application was filed October 2, 1917, and the patent issued July 21, 1925. In it the auxiliary engine cylinders drive the crank shaft, which has fixed upon it a gear designed to mesh with another gear on the truck axle. There is no idler gear, but two other gears are always in mesh, and the axle is driven by clutching one of these to the axle by means of a cone clutch operated by a lever and the piston of a cylinder. Steam is applied to the booster cylinder in one of three ways. The booster steam supply line leads off the main steam supply pipe just before that pipe enters the main cylinders. By this means, the inventor places a control and a steam supply to the booster under the control of the main engine throttle lever. The valve in the booster supply line is the booster throttle valve, which is under control of the engineer by means of the hand lever placed in the cab of the locomotive. When the engine reaches a predetermined speed, the governor, which is driven from the driving axle, will shut off steam from the booster cylinders and the clutch cylinder. The clutch is then supposed to release, but, apparently, it needs some means to pull it out of the clutching relation.

The booster engine is under the control of the reverse lever, for the valve and reversing mechanism of the booster are controlled by a rod which is provided, so that the operation of the booster throttle is synchronized with the main driving means of the locomotive. When the booster throttle is in a fixed position, the booster motor may be used independently of the main engine, and even though the main throttle is closed, so that no steam is supplied to the main engine, again the governor operates to cut off steam from the booster cylinders and the clutch at a predetermined speed, and again steam can operate the booster cylinders only when the reverse lever has been set in such a position as to prevent the operation of the cylinders through the valve and booster-reversing mechanism.

Still another method is to supply steam through a valve pipe, the clutch cylinder, and another pipe to the booster cylinders. This

enables the use of the booster, irrespective of the governor, but the booster cylinders may not be operated, unless the steam is also admitted to the valve and reversing mechanism, which may be done with or without the operation of the main engine, but it necessarily involves the actuation of the reverse lever. Thus, in the three methods of the operation of the booster, the control is with the reverse lever, and not necessarily under the control of the main lever. Thus the booster may be operated independently of the main lever.

Having in mind that the system or systems of this patent depend upon the operation of the reverse lever, and comparing it with the appellant's system, it will be found that, in the latter's arrangement, the reverse lever is operated just as it always has been operated, and the booster engine is operated by other means and entirely irrespective of what may be the position of the reverse engine. While both in common have auxiliary engines operated by steam from the boiler and a clutch mechanism, that of itself is not sufficient upon which to base infringement, in view of the state of the prior art to which we have referred.

Where, as now, a separate motor is used to provide increased steam, a superheater is located between the main throttle and the main driving cylinders. The appellant's arrangement provides for a superheater steam supply to the booster under the tender, and the main throttle will cut off or admit superheated steam into the piping leading into the main cylinders and into the booster cylinders. The appellees use superheated steam for their booster, and also locate the booster under the tender. In so doing, both appellant and appellees in their systems provide for power operation of the clutch mechanism as distinguished from hand. But it was old to operate the clutch devices by power. (Stuller patent.)

The devices of both the appellant and the appellees are combined in different ways. Appellant has made its arrangements within what was disclosed by the prior art. Claim 16 of the patent provides for "a combination with the main driving means of a steam-propelled locomotive and its throttle lever, and means controllable by said throttle lever for operatively connecting the booster motor with and disconnecting the same from the locomotive." "Means controllable by the throttle lever" is the reversible mechanism which is operated by the main reverse lever; but it is clear that the clutch cylinder will be controlled either by opening the valve, or by setting the valve, so that steam in each event

may flow to the clutch cylinders and to the booster controlling mechanism. Thus there is no operative relation between the clutch cylinder and the throttle lever. If claim 16 be read upon appellant's structure, in which the opening of the main throttle valve is not enough to connect the booster opened without opening the booster throttle, it was clearly anticipated by Cruezbaur, in which the throttle lever is operated both to control the admission of steam into the booster motor and to connect and disconnect the motor clutch, about which the gear train connected to the driving axle is actuated.

Moreover, the appellees have filed a disclaimer, in which they state that they enter such disclaimer to that part of the claims in the specification which provide for the combination of locomotive with the main driving means of the locomotive; a booster motor for aiding said main driving means in starting the locomotive and propelling it at low speeds, and the steam-actuated mechanism for controlling the operation of the booster. And this, they said, was not patentable, in view of the disclosure and claims of the patent in suit prior to patent No. 1,339,395. In this latter patent, the disclosure and claims relate to the control of the booster by means of the controls for the main driving means.

Claims 19 and 21 contain the limitation "steam-actuated device." This necessarily means that the invention is referring to the booster-reversing mechanism, which manifested in the claims as a "steam-actuated device controllable by the throttle lever," and is "for operatively connecting the booster motor with the locomotive and admitting steam to the booster motor." The appellant has two forms of apparatus, and in them it has no steam-actuated mechanism or device which admits steam into the booster motor, for in both the steam, on the opening of the booster valve, is free to flow directly to the booster cylinder and begins actuating then. In the first form, the piston does not retain the steam flow until the operation of the booster begins to operate the idler gear, but it does not prevent the actuation of the booster cylinders by the steam, and there is ample steam for the appellant's booster to operate before the piston moves the idler gear into mesh. In the second form, there is nothing to prevent the free passage of the steam to the booster cylinders and instantaneous actuation of the booster.

Therefore there is no steam-actuated mechanism or device for controlling the operation of the booster or the admission of steam to the booster. The appellant's con-

trol member is to manually operate the booster throttle. Nor may the appellees say that the steam-actuated mechanism or device for controlling the booster, as referred to in claims 19 and 20, is in its clutch cylinder. It is said, in claim 16 of the patent, that it provides a steam-actuated mechanism under control of the controlling devices of the main driving means for governing the operation of the booster, manifestly referring to the reversing mechanisms on the clutch cylinder. The clutch is under the control of the valve (*14a*) and merges itself under the control of the main throttle, and neither is effective of itself without the operation of the booster-reversing mechanism. Thus claims 19 and 21 relate to a steam-actuated device controllable by the throttle lever for operatively connecting the booster motor and the locomotive.

■ The appellant's reverse lever has no connection with its booster, and its main mechanism is its hand-operated booster throttle, and therefore these claims cannot be read on the appellant's structure. To read them upon the appellant's structure would result in meeting what Helmholtz taught the art in his combination, in which the throttle lever controls the steam-actuated device in lowering the auxiliary driving axle into operative position upon the rails and admit steam to the booster motor, so that it might drive the auxiliary axle. The two combinations are not identical because they are intended to obtain the same results. The end sought must not only be the same, but the devices or mechanical means to secure the desired result must be the same. Hubbell v. United States, 179 U. S. 77, 21 S. Ct. 24, 45 L. Ed. 95; Westinghouse v. Boyden Power-Brake Co., 170 U. S. 537, 18 S. Ct. 707, 42 L. Ed. 1136.

Moreover, this patent represents an expansion of the disclosure of the original application shown by the file wrapper. The specifications had been canceled and rewritten three times, so that the patent specification was the fourth. It became a part of the case on June 20, 1922, five years after the original application was filed, and the original statement of the invention contained in the application largely disappeared, doubtless due to the prior patents referred to, which show the same varieties of driving connections; but when, after the original application became forfeited for nonpayment of the penalty final fee, on February 15, 1920, and on the next day, when a renewal application was filed, and the new object of the invention was stated, all the claims were then canceled and new claims inserted, and the only claim relating to the control mechanism referred to "steam-actuated mechanism for controlling the operation of the booster."

■ Patent No. 1,339,395, issued May 11, 1920, and here in suit, covered control mechanism claims, and it was stated: "The broad invention involved in this system of automatic or semiautomatic control of the booster is not claimed herein," and thus contained claims on the subject-matter which the appellees later sought to obtain more broadly in patent No. 1,547,155. The control claims of the divisional application of November 15, 1920, were all limited to steam-actuated mechanisms for controlling the operation of the booster, or to narrower terms. But with the amendment of July 6, 1921, claims 8 to 26 were added, many of which had neither the limitation to steam-actuated mechanism nor to controlling the operation of the booster, and these were not within the scope of the object of the divisional application, which was to provide "controlling apparatus actuated by steam pressure taken from the locomotive boiler for governing the operation of the booster." Hence, having eliminated the control claims from the original application, and after inserting claims on a steam-actuated booster control, and stating that the application was limited to such a control, the inventor could not broaden his claim to a scope coextensive with, or even broader than, the claims he transferred on November 14, 1919, to the application of the patent No. 1,339,395. Goodyear Dental Vulcanite Co. v. Davis, 102 U. S. 222, 26 L. Ed. 149. If claim 16 is construed to cover broadly any means operative to effect the connecting or disconnecting of the booster with the locomotive, it will be of no avail, for this would be merely a distinction in breadth and scope between the claims of the two patents. Miller v. Eagle Mfg. Co., 151 U. S. 186, 14 S. Ct. 310, 38 L. Ed. 121; Vapor Car-Heating Co. v. Gold Car Heating & Lighting Co. (D. C.) 296 F. 188; Holmes Electric Protective Co. v. Metropolitan Burglar Alarm Co. (C. C.) 33 F. 254.

■ The fact that the application for patent No. 1,547,155 was involved in an interference with the McGrew & Loree application (serial 552,525), and that the appellant was a privy to that interference and bound by its determination, is of no importance here, because the appellant's structure is not that described in the McGrew & Loree booster pamphlet. Neither appellant's first nor second form are shown. In the interference, all the Patent Office decided was, as between Ingersoll and McGrew & Loree, who was the prior inventor of the ideas contained in the claims in is-

sue. It did not decide what was the scope of these claims. Morgan v. Daniels, 153 U. S. 120, 14 S. Ct. 772, 38 L. Ed. 657; Hillard v. Remington Typewriter Co. (C. C. A.) 186 F. 334; National Machine Co. v. Wheeler & Wilson Mfg. Co. (C. C.) 72 F. 185.

We conclude that the appellant's first and second forms of its booster are operated directly under the control of its manually operated auxiliary throttle, and are different from the appellees' booster operated under the control of the controlling devices of its main throttle and its reverse lever.

Ingersoll's patent, No. 1,339,395, represents a further development of the booster engine by means of the reversing lever and main throttle, by which the inventor brings into operation a combined air and steam control—the so-called dual control. By it he says he is enabled to most efficiently operate a booster motor at low speeds, as in starting the main locomotive, and then, when the main locomotive attains a predetermined high speed, cut out the booster motor; this cutting out being done when the assistance of the booster motor is no longer required. This dual control consists in the actuation of the gear-shifting piston by compressed air and the use of steam, when steam is admitted to the main engine to shift a valve, so as to enable the compressed air to open the booster throttle valve, and thus permit the steam direct from the boiler to enter the cylinders of the booster engine.

The appellant's forms provide for the steam from the superheater. In the appellees', steam is used to operate the valve, which, when operated, admits compressed air to open the booster throttle valve, while, at the same time, compressed air acts to mesh the gears. The engineer, in such operation, must advance his reverse lever "into the corner" or extreme position. He must step on the treadle to depress the dog, as otherwise, as he advances the reverse lever, a pin will enter the notch in the end of the dog, and will be prevented from striking the end of the air control valve. When the treadle is thus depressed, permitting the extreme movement of the reverse lever, it will actuate the valve to admit compressed air from the reservoir to the line. The admission of air into the line actuates the piston and the cylinder to entrain the booster gears. The engineer must also open the main throttle valve, because the control system is so planned that the booster throttle valve could not be opened until the reverse lever and the main throttle

were in certain defined positions, so as to make the operation of the booster fool-proof.

The inventor provides that, as steam is admitted to the dry pipe leading to the engine by the actuation of the main throttle valve, it will pass through the pipe and actuate the valve, thus admitting compressed air from the pipe to another pipe, and thence to the piston, which opens the booster throttle valve and thus admits steam through the pipe to the booster cylinders. When the reverse lever is moved away from its extreme position, so that it no longer holds open the valve against the pressure of the springs, the compressed air is cut off from the lines. As the air is exhausted from the lines, the spring of the cylinder will press the piston upward, and thus close the booster motor valve, and at the same time the spring in the gear-meshing cylinder will move the piston to a position which will cause the idler gears to be disengaged from the axle gears, thus shutting down the operation of the booster motor. When the inventor speaks of the operation of the booster member as "being dependent upon the manipulation of the controlling devices of said main driving means," he refers to a particular structure in which, by the operation of his throttle and reverse lever, he is controlling the flow of steam through the separate booster supply pipe, which is different from the appellees' structure, in which the engineer, when once steam has been admitted to the auxiliary line by the opening of the main throttle, merely needs to open his auxiliary valve to set the booster in motion, instead of having to open first the throttle to condition his control system for operation, and then move his reverse lever and the foot treadle, so as to permit the reverse lever to go into extreme position and actuate the air valve to cause the meshing of the gears and operation of the auxiliary throttle.

In appellant's structure, the engineer can always open his booster throttle valve, although steam will be found in the booster steam supply pipe only if the main throttle is open. In this patent in suit, steam is always in the booster steam supply line, but the engineer has no independent means of opening the booster throttle valve. He must operate it as indicated. Thus this patent's control mechanism is dependent on the operation of the reverse lever and the main throttle, but the operation is completely dependent on the position of these two mechanisms and on that of the dog for the reverse lever, whereas, in the previous patent, the operation of the booster was always dependent upon the posi-

tion of the reverse lever. In any case, it is impossible to operate without setting the reverse lever in a proper position and also depressing the dog, so as to permit the reverse lever to operate the air control valve; whereas, in the appellant's booster, the position of the reverse lever has nothing to do with putting the booster in operation, and it has no dog or safety latch. The appellees have labored for a safe device and attempted to make it fool-proof. The appellant has merely depended upon the manipulation of the engineer in the use of the booster throttle.

Claim 32 only was held infringed in the court below. This claim, in providing that the booster motor is in combination with the main driving means, can only be sustained if some relation exists between the main driving means of the booster, and such relation exists through the main throttle and the reverse lever. Otherwise it would be an aggregation. The appellant's control device is the booster throttle, and is not in operative relation to the reverse lever, or to the throttle, or any moving parts of the main driving means control. The appellant's system is not in combination with the main driving means; it has no connection therewith, and may be operated independently thereof to drive the engine, which cannot be done in the case of the booster in the patent in suit. The inventor has limited claim 32 to a structure in which the main driving means is connected with the means for operating the booster; that is, both the reverse lever and the main throttle. The appellant does not infringe this claim.

Patent No. 1,383,633 is referred to as the sequential control patent. It is a further development of making the operation of the booster safe. In its specifications it is said to be "an improvement upon the controlling means disclosed in a companion application," resulting in the patent just referred to. In this patent the air-controlled circuit is so arranged that the meshing cylinder must be advanced to such an extent that the idler gear is actually in mesh with the axle gear before the pipe is uncovered, so as to permit air to pass through the valve and actuate the cylinder which controls the booster throttle. By the mechanism employed, the sequence of entrainment of the gear and opening of the booster motor is assured, and also the reverse sequence follows; that is, the booster throttle is first closed by the automatic operation of the air circuit, and then the meshing cylinder causes retraction of the idler gear. In appellees' commercial structure, provision is made for the admission of steam into the cyl-

inders, so that the cylinders may rotate before the idler gear comes into mesh with the axle gear. The invention requires a definite sequential relation; first, that the gears must be entrained before steam is admitted to the cylinder of the auxiliary engine.

Claims 16 and 17 are in suit, and provide definitely that the booster is first operatively connected with the locomotive, and therefore supplied with steam, and, when it is put out of operation, steam is first cut off, and the motor valve disconnected from the locomotive. The appellant's first form of mechanism does not have "controlling means for the aforesaid mechanisms * * * whereby, when the booster is put in operation, it is first operatively connected with the locomotive and thereafter supplied with steam, and when it is put out of operation steam is cut off therefrom and the motor thereafter disconnected." The appellant's form does not have any such insured sequential action, but the booster engine starts before the gears mesh. There is also a difference in the general organization. Appellant's first form has a main operated booster throttle, which admits the steam to the booster and gear-shifting mechanism, merely because it retards the action of the fuel supply of steam to the booster motor. It has no separate means for supplying energy to the motor. In the patent in suit, steam does not go to the motor until after the gears engage, while in appellant's system the steam which causes the motor to turn over slowly comes to the motor before gear engagement.

Nor may it be said that these claims cover appellant's first form, because the gears are meshed before sufficient steam is supplied to cause the axle to be driven. The claims in suit make the definite statement that, when the booster is put into operation, it is first operatively connected with the locomotive and thereafter supplied with steam. In Cruezbaur, the gears are moved just before the auxiliary engine was energized by steam. In Stuller, the pinion gears are brought into mesh with the gears to be driven before the auxiliary motor is energized, and there is the same sequence as in the patent in suit. In Helmholtz, the auxiliary motion is set into rotation just before the auxiliary set of wheels is brought into engagement with the rails. Thus the claims of the patent in suit are limited to an operative sequence. The appellant does not have such operative sequence.

For the reasons we have stated, it is apparent that the claims were erroneously held

infringed in the district court. The decree must be reversed, with directions to enter the decree for the appellant, with costs.