## INGERSOLL et al. v. BETHLEHEM STEEL CO.

## FRANKLIN RY. SUPPLY CO. v. SAME.

### Nos. 5137, 5138.

Circuit Court of Appeals, Third Circuit.

Sept. 26, 1934.

Synnestvedt & Lechner, of Philadelphia, Pa. (Edward H. Davis,. Harvey Lechner, and Paul Synnestvedt, all of Philadelphia, Pa., of counsel), for appellants.

Howson & Howson, of Philadelphia, Pa. (Charles Neave and Clarence D. Kerr,. both of New York City, of counsel), for appellee.

Before BUFFINGTON, WOOLLEY, and THOMPSON, Circuit Judges.

PER CURIAM.

Two appeals, Nos. 5137 and. 5138, are here involved. In the court below the appellants, hereafter called plaintiffs, brought suit against the Bethlehem Steel Company, hereafter called defendant, on ten patents. On final hearing that court dismissed the bills, holding that forty-one claims of such patents were invalid and nineteen were not infringed. Whereupon these two appeals were taken on eight of the patents and are both disposed of in this opinion.

Some of these patents were in issue in the District Court for the Southern District of New York and in the Circuit Court of Appeals of the Second Circuit. See Ingersoll v. Delaware & Hudson Co., 37 F.(2d) 465. Reference to these two opinions for information saves needless repetition on our part.

Broadly speaking, these patents aim to increase the efficiency of locomotives by equipping them with auxiliary engines which, in the speech of the art, are called "boosters." The use of boosters in some form is almost as old as locomotives themselves, the American patent of Cathcart, No. 6818, dating back to 1849, and their general use is shown by the British patent of Sturrock, No. 40,-715, in 1863, the German patent No. 202,831 of Liechty in 1904, and the patent of Helmholtz, No. 516,436, in 1894, embodied in the Krauss engine of the Bavarian State Railways. In that regard the plaintiffs concede: "It is frankly recognized that the broad idea of applying an auxiliary motor to a locomotive for the driving of wheels to supplement the main driving wheels, was suggested long ago in this art—in fact as far back as a half a century or more."

The problem of a locomotive· itself increasing its efficiency by increasing its weight or increasing the number of its driving wheels is one method, or, on the other hand, by utilizing through an auxiliary booster engine the *nontractive, supporting front or rear wheels* on the locomotive or those supporting the tender. As illustrative of the situation, we quote the accurate and enlightening statement in plaintiffs' brief, as follows:

"The 'booster' is a small, auxiliary propulsion unit for a locomotive and is used to supplement the main driving means of the locomotive in starting a train and drawing it at slow speeds and on grades. It is not used at high speeds, under which condition its drive is *disconnected*. It is intended to enable the locomotive to start and draw a heavier train than the locomotive could otherwise start and draw in the absence of such an auxiliary.

"Such a device can be employed because every locomotive has a boiler which is capable of generating enough steam for high-speed operation. This is more steam than is needed in starting and at low speeds.· The boiler therefore has surplus steam available in starting and at. low speeds. The booster uses this surplus steam, converting it into draw pull at the time it is most needed.

"Practically every locomotive has *idle*, weight carrying wheels in addition to its larger driving wheels—this for the purpose of distributing the weight. These wheels and their axles are mounted in truck frames pivoted to the main frame of the locomotive and to the frame of the tender of the locomotive."

The defendant's brief thus describes it:

"A train of cars requires greater pulling force to start it from rest than is required for keeping it in motion in normal running after it is once started, because, in starting, the inertia of the weight of the train and static friction must be overcome. Also, greater force is required to pull a train up a grade than in running on the level.

"The pulling force is exerted by the driving wheels of the locomotive which are caused to revolve by the engine on the locomotive. Those wheels support a large part of the weight of the locomotive, so that, when the wheels are caused to revolve, there is considerable friction between the treads of the wheels and the rails, and thus the locomotive tends to move forward and exert a pull on the train. If, however, the train is very heavy, the tractive effect, due to the friction between the treads of the driving wheels and the rails, may not be sufficient to move the train, in which event the driving wheels, instead of rolling forward on the rails, will

merely slip on the rails and be revolved without exerting any substantial tractive effect.

"So the pulling force available for starting a train is dependent not only on the power of the locomotive engine but also upon the tractive effect as between the driving wheels and the rails.

"The locomotive engine, at starting and in ascending grades, commonly has a large surplus of power available for causing the driving wheels to revolve. The limiting factor then becomes the tractive effect of the driving wheels on the track rails. If that tractive effect could, in some way, be increased, a locomotive could start a heavier train and carry it up heavier grades. * * *

"One way adopted to obtain greater tractive effect was to use heavier locomotives (thus producing greater friction between driving wheels and rails and lessening the tendency to slip) and to use a greater number of wheels driven by the same engine, thus creating more points at which the friction and tractive effect could be exerted.

"Another way adopted to obtain greater tractive effect was to make use of some other wheels running on the rails (such as the front or rear track wheels on the locomotive, or wheels on the tender) and drive those wheels by another engine mounted on the locomotive or tender—an 'auxiliary' or 'booster' engine—operated by steam from the locomotive boiler. Thus, wheels which had formerly acted merely to assist in carrying the weight of locomotive, or tender (and usually are smaller than the driving wheels) were utilized to create tractive effort when additional tractive effort is needed; and the auxiliary or booster engine could be disconnected from these additional wheels and steam could be cut off from it at times when additional tractive effort was not needed."

In considering these patents two things are to be borne in mind: First, for several decades railroads were the most important industry in the United States; and, secondly, the highest type of scientific engineering was employed in their improvement. During that period more patents bearing on railroads were issued than in any other field, a statement quite clear when we consider the many phases of that art for which patents were sought, as, for example, nut locks for rails, couplers for cars, air brakes, signaling systems, stokers for engines, and many other features in this superpatented field. In deciding a case involving the construction of car wheels, this court in Hansen v. Slick (C. C. A.) 230 F. 627, 632, in refusing, of its own motion, to sustain the claimed patent monopoly of two able scientific railroad engineers, said: "Modern conditions have made high engineering and mechanical skill ordinary incidents in many industries, and such technical skill is to be regarded as the incidental advance of commercial pursuits. It follows therefore that such advance in the art as results from this skill the public is entitled to avail itself of as a fruit of mechanical growth and advance."

With these considerations in view—and rightly so—the trial judge reached the conclusion that all the claims of the ten patents in issue were either invalid or were not infringed. After thorough argument by counsel, and aided by exhaustive briefs, all the members of this court have reached the conclusion that the trial judge committed no error on the questions of invention and infringement. His exhaustive and self-vindicating opinion, addressed particularly to each claim in suit, leaves little to be added. An attempt by this court to write a comprehensive opinion with like particularity would be but a studied effort to clothe in different language what he has already said. But without restricting ourselves to such opinion, we add a few considerations that result from our study of the case.

We find nowhere any acts of a high inventive character. The plaintiffs' booster accomplishes no novel inventive function, so far as the motive forces of steam and air exerting themselves in any new way, and the booster functionally responds to the quantum of force supplied. It affects the locomotive in no new functional way; its function is to afford additional power to move the locomotive. So also regarding infringement. Conceding the use and arrangement of plaintiffs' means, in the way of well-known mechanical means, is clever, original, and effective, the most that can be said is that the combinations involved are the result of good engineering and its sustained claims were rightly confined to the particular means shown. In doing so we have given consideration and just regard to the many contentions made by plaintiffs' counsel. As we view such contention, we gather that it is urged that the plaintiffs' booster, as now used on locomotives, is a self supporting unit mounted on the axle of a supporting, but normally nondriving, wheel of a locomotive, and that this unit is not affected, either vertically or laterally, by the movement of the locomotive frame. In that regard the plaintiffs contend:

"Thus it will be seen that all of the above-described parts are associated and mounted in such a way as to constitute a single, self-contained unit or whole, by virtue of which the proper operating relationships of all of the parts are maintained. In other words, the truck and its axle and the motor and its parts, constitute a self-contained auxiliary propulsion unit in which, nevertheless, its driving means between the motor and the axle is connectible and disconnectible, i. e., entrainable and disentrainable.

"This self-contained feature of construction is an important one.

"It will be seen that when the auxiliary propulsion unit is not in use, the truck, which forms a part thereof, must function in its usual manner, i. e., its wheels must help to carry part of the weight of the locomotive superstructure. The truck must also be free to swing laterally in going around curves, irrespective of whether the booster motor is or is not in use. Also the superstructure of the locomotive, being mounted on springs, moves vertically up and down with respect to the axles and the rails upon which the wheels of the axles ride, as well as laterally."

Regarding the gist of the plaintiffs' primary basic patent No. 1,375,293 and its divisional patent as to the location of the booster motive power on the axle of a normally nondriving, but simply supporting, wheel, two questions arise, viz.: Did this involve invention, and did such patents solve the problem by a successful working device? The court below found the first invalid because anticipated, and the second not infringed.

The booster now placed by plaintiffs on locomotives is treated in the argument of the case as being the booster disclosed by the basic patent above and its divisional issue, but such is not the fact, or, at least, there is no proof that a booster constructed solely on the disclosures therein made would have been successful. On the contrary, the plaintiffs themselves show that other important, if not indeed indispensable, patentable features were subsequently patented and are embodied in the boosters now placed on locomotives by plaintiffs. In that regard we note that, as contended by plaintiffs, to quote their own brief: "In giving effect to the self contained unit characteristic, there is the following problem. As part of such a unit, there must be a driving connection between the motor and the axle to be driven, which driving connection must be connectible and disconnectible, i. e., entrainable and disentrainable. * * * How to provide an effective driving connection which is connectible and disconnectible and which is nevertheless entirely a part of the self-contained unit, is another problem which Ingersoll solved by the train of three gears to which claim 32 of patent 1,339,395 on appeal is directed."

In that connection we note that the booster of the plaintiffs was located under the locomotive proper, where space is necessarily very restricted, and not under the tender as is defendant's. This created a problem of workable bearings, or, as stated by plaintiffs, "the bearing pressures developed when operating the booster are far in excess of pressures developed in ordinary mechanical applications." Now this all-important question of suitable bearings in this space restricted location was met, not by the basic patent and its divisional issue, but by another and subsequent patentee, viz., Peters, in his patent No. 1,539,270, granted May 26, 1925, now owned by plaintiff.

In like manner, there was also, to quote from plaintiffs' contention, "the problem of preventing clashing and destruction of the gears constituting the driving connection between motor and axle. If, for example, the boiler cylinders were receiving steam in sufficient quantities to 'race' them before the gears were entrained, there would be danger of the gear teeth being ripped off." This difficulty is met in the booster made by plaintiffs by the subsequent patent of Ingersoll, No. 1,383,633, granted July 5, 1921. So also the problem of securing easy meshing of the gear teeth in the act of entraining, particularly when the booster motor is to be put into operation when the locomotive is already in motion, and this was met by the reissue patent of Peters, No. 16,483, granted November 23, 1926, also owned by plaintiff.

Without discussing in detail further difficulties which developed and which were solved by subsequent patents and patentees, we use plaintiffs' statement:

"Owing to the relative movements as between the axle of the truck and the truck frame hereinbefore mentioned (not to be confused with relative movement as between the superstructive and the truck), and owing to the fact that the booster motor bed plate has to be supported from the axle, problems of warping and distortion, bring about concomitant bearing troubles, had to be met, and these are solved by the subject matter of the claims on appeal of the Roberts and Peters patent No. 1,602,124.

"In addition, because of high bearing pressures when in use and other conditions

peculiar to this device, adequate lubrication of certain of the parts presented a problem which is solved by the subject matter of the claims of the Roberts patent No. 1,600,427 on appeal."

From these facts it will be seen that the earlier patents of Ingersoll had to be supplemented by later alleged inventions of himself and other patentees before the originally disclosed booster was brought to its present alleged efficiency. These considerations tend to show us that the original patents of Ingersoll did not disclose a booster of the perfected character of the boosters now placed on locomotives. Without entering into further discussion, and in view of the exhaustive opinion of the trial judge, we limit ourselves to affirming the decrees of the court below on the judge's opinion, and dismissing the appeals taken thereon.